**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ARTHUR LAVIN, *et al.*, )<br>               )<br>    Plaintiffs, )<br>               )<br>    v.           )<br>               )<br>JENNIFER BRUNNER, *in her official* )<br>*capacity as Ohio Secretary of State*, )<br>               )<br>    Defendant. )</td> | CASE NO.   1:10-CV-1986<br><br>MAGISTRATE JUDGE VECCHIARELLI<br><br>**REPORT AND RECOMMENDATION**<br>DOC. NO. 2 |

This case is before the magistrate judge on referral.  Before the court is the motion of plaintiffs ("Motion"), Arthus Lavin ("Lavin"), Jason Chao, Michael W. Devereaux, Patricia J. Kellner, Jerome Liebman, Eric R. Schreiber, Constance D. Magoulias, Peter A. DeGolia, and Nathan R. Beachy, for a preliminary injunction against defendant, Jennifer Brunner, in her official capacity as Ohio Secretary of State, to prohibit her from enforcing Ohio Rev. Code § 3599.45 ("Motion").  Doc. No. 2. Defendant opposes plaintiffs' motion ("Opposition").  Doc. No. 10.  For the reasons given below, plaintiffs' motion should be granted and a preliminary injunction against enforcement of Ohio Rev. Code § 3599.45 should issue.

I.

Plaintiffs assert federal jurisdiction pursuant to 28 U.S.C. §§ 1331; 1343(a)(3), (4); 2201; and 2202; and 42 U.S.C. §§ 1983 and 1988.   Plaintiffs are Ohio physicians who are also Medicaid providers.  Defendant Jennifer Brunner (the "Secretary"), is the

chief elections officer of Ohio and is charged with enforcing the state"s election laws. The parties do not dispute the following facts.

Medicaid is a federal program initiated by Title XIX of the Social Security Act in 1965.  Pursuant to Title XIX, the federal government distributes lump-sum payments to participating states to provide medical assistance and rehabilitation to the poor, disabled, and aged and their dependents.  The states participating in the program must ensure that the plan is efficiently administered.  In Ohio, the Ohio Department of Job and Family Service ("ODJFS") administers Medicaid.  Providers submit billings for medical services pursuant to Medicaid to the ODJFS.

Medicaid constitutes about 26% of Ohio's budget.  Medicaid fraud is a national problem and a problem in Ohio.  The Ohio Medicaid Fraud Control Unit ("MFCU") consists of 59 full-time employees.  In the year between July 1, 2008 and June 30, 2009, the MFCU received 377 complaints of Medicaid fraud, of which 316 resulted in investigations and 76 convictions.  Eleven of those investigations involved doctors. There is no evidence in the record that Medicaid fraud is or ever has been more or less of a problem in Ohio than it is nationwide.

In 1978, the Ohio General Assembly adopted Senate Bill 159.  This bill included provisions barring Medicaid providers from fraudulently claiming payments for ostensible services.  The bill also contained the following provisions:

> (A) Upon the written request of the governor, the general assembly, the auditor of state, the director of job and family services, the director of health, or the director of budget and management, or upon the attorney general's becoming aware of criminal or improper activity related to Chapter 3721and the medical assistance program established under section 5111.01 of the Revised Code, the attorney general shall investigate any criminal or civil violation of law related to Chapter 3721of the Revised Code or the medical assistance program.

2

(B) When it appears to the attorney general, as a result of an investigation under division (A) of this section, that there is cause to prosecute for the commission of a crime or to pursue a civil remedy, the attorney general may refer the evidence to the prosecuting attorney having jurisdiction of the matter, or to a regular grand jury drawn and impaneled pursuant to sections 2939.01 to 2939.24 of the Revised Code, or to a special grand jury drawn and impaneled pursuant to section 2939.17 of the Revised Code, or the attorney general may initiate and prosecute any necessary criminal or civil actions in any court or tribunal of competent jurisdiction in this state. When proceeding under this section, the attorney general, and any assistant or special counsel designated by the attorney general for that purpose, have all rights, privileges, and powers of prosecuting attorneys. The attorney general shall have exclusive supervision and control of all investigations and prosecutions initiated by the attorney general under this section. The forfeiture provisions of Chapter 2981of the Revised Code apply in relation to any such criminal action initiated and prosecuted by the attorney general.

(C) Nothing in this section shall prevent a county prosecuting attorney from investigating and prosecuting criminal activity related to Chapter 3721of the Revised Code and the medical assistance program established under section 5111.01 of the Revised Code. The forfeiture provisions of Chapter 2981of the Revised Code apply in relation to any prosecution of criminal activity related to the medical assistance program undertaken by the prosecuting attorney.

Ohio Rev. Code. § 109.85(A).  The Attorney General and the county prosecutors have a

great deal of discretion in determining what they shall prosecute as medicaid fraud.

Senate Bill 159 also contained the following provision, in relevant part:

(A) No candidate for the office of attorney general or county prosecutor or such a candidate's campaign committee shall knowingly accept any contribution from a provider of services or goods under contract with the department of job and family services pursuant to the medicaid program of Title XIX of the "Social Security Act," 49 Stat. 620 (1935), 42 U.S.C. 301, as amended, or from any person having an ownership interest in the provider. . . .

(B) Whoever violates this section is guilty of a misdemeanor of the first degree.

Ohio Rev. Code § 3599.45 ("§ 3599.45").  The state senator who sponsored SB 159,

Senator Harry Meshel, was unable to recall any circumstances of actual corruption or

the appearance of corruption by Medicaid providers that prompted the band on their

3

contributions to the campaigns of those prosecuting Medicaid fraud.[1]

Medicaid providers include hospitals, long-term-care facilities, physicians, providers of dental services, providers of vision-care services, providers of podiatric services, providers of physical therapy, providers of occupational therapy, providers of psychology services, providers of pharmacy services, providers of medical supplies, providers of durable-medical equipment, providers of orthoses, providers of prostheses, independent laboratories, providers of x-ray services, Ohio home-care providers, providers of home-health-care services including nurses, health aides, speech-and-language-pathology services, ambulatory health-care-clinic services, providers of early-and-periodic-screening diagnoses, medical-transportation-service providers, rural-health-service providers (including clinical social workers, physician assistants, nurse practitioners, and nurse midwives, clinical psychologists, preconception-careservice providers, ambulatory-surgery-center eligible providers, providers of alcohol-and-drug-addiction services, and outpatient health-facility-service providers).  Ohio Admin. Code §§ 5101:3-2 through 5101:3-16; 5101:3-22; 5101:3-29 through 5101:3-30.  A provider can also be the operator of an entity that provides Medicaid services, the "person or government entity responsible for the daily operating and management decisions for a

---

[1]  *See* Declaration of Harry Meshel, Motion, Exh. 8.  Ohio does not preserve legislative history.  In a similar case in Missouri, a state which also does not preserve legislative history, the Supreme Court considered  in reaching its decision the inclusion of an affidavit from Missouri state senator Wayne Goode, the co-chair of the state legislature's Interim Joint Committee on Campaign Finance Reform at the time Missouri enacted its contribution limits, to establish the motives behind limiting campaign contributions.  *Nixon*, 528 U.S. at 393-94.  However, as more than thirty years have passed between the legislation enacting Ohio's campaign limits and Senator Meshel's declaration, the court assigns little or no probative value to that declaration.

4

nursing facility or intermediate care facility for the mentally retarded."  Ohio Rev. Code § 5111.20(Q), (V).  Section 3599.45 bars contributions to the campaigns of any person running for Attorney General or county prosecutor by any person having an ownership interest in such a provider, without limitation on the size of the ownership interest.

Ohio is the only state that prohibits, limits, or criminalizes campaign donations by Medicaid providers.  Ohio also bans political contributions from children under the age of seven, foreign nationals, and certain state employees who would be employed by, or in the same state agency or office as, the candidate.  *See* Ohio Rev. Code §§ 3517.13(W)(1); 3517.102(B)(1)(c), (C)(1)(a)(I); and 3517.092(B)(2); *see also* 2 U.S.C.A. § 441e(b), prohibiting political donations by foreign nationals.  The penalties for violating these bans are civil penalties.  *See* Ohio Rev. Code §§ 3517.992(AA1), (AA2); 3517.992(I)(1), (J)(1), (I)(6), (J)(5); 3517.992(M)(2).  In addition, Ohio state agencies may not award unbid contracts in excess of $500 to any entity that, during the previous two years, has contributed over $1,000 to the campaign of any agency official responsible for awarding contracts.  Also, certain state contractors may not contribute more than $1,000 to the campaigns of officials awarding contracts for a year after the award of a contract.[2]  Contractors who violate these rules face civil penalties and the cancellation of their contracts.

Plaintiffs assert that the Secretary is charged with enforcing Ohio's election laws. Defendants reply that the Secretary is not charged with prosecuting violations of § 3599.45.  Responsibility for prosecuting violations of that statute falls to the Attorney

---

[2]  This latter provision is not currently in effect.

5

General and county prosecutors.  In addition to prosecuting health care fraud, the Ohio

Attorney General prosecutes violations of antitrust law, charitable law, civil rights,

consumer law, criminal law, education law, employment law, environmental

enforcement, labor relations, public-utilities law, tax law, tobacco law, transportation law,

and workers' compensation law.  The Attorney General also engages in appellate

litigation, collections enforcement and revenue recovery, and the defense of the state of

Ohio in the Court of Claims.

In July 2010, Lavin contacted the campaign office of Ohio Attorney General

Richard Cordray ("Cordray") to ask how plaintiffs might make a donation  for his

campaign for re-election.  The campaign office told Lavin that it could not accept

campaign contributions from plaintiffs because they served patients insured by

Medicaid.  Plaintiffs also discovered that Cordray's website warns potential donors,

"Please note that [the Cordray re-election committee] is not permitted to accept

campaign contributions from a provider of services or goods under contract with the

department of job and family services pursuant to the Medicaid program . . . or from any

person having an ownership interest in the provider."  Keep Attorney General Cordray,

@ donate.cordrayforohio.com/page/ contribute/contribute, Motion, Exh. 2.

Upon learning that they would not be able to contribute to Cordray's campaign,

plaintiffs filed this suit in federal court.  Plaintiffs' complaint seeks a declaratory

judgment that § 3599.45 violates the First and Fourteenth Amendments to the United

States Constitution and an injunction barring the Secretary and those acting on her

behalf from enforcing § 3599.45 against those candidates to whom plaintiffs make

campaign contributions.  Plaintiffs now move for a preliminary injunction barring Brunner

6

from enforcing § 3599.45.

II.

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curium*) (citation omitted) (emphasis in original).  Generally, a district court must consider four factors when deciding whether to issue a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay.

*Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2010) (quoting *Northeast Ohio Coalition for the Homeless and Serv. Employees International Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)).  *See also Miller v. City of Cincinnati*, ___ F.3d ___, ___, 2010 WL 3719904, at *5 (6th Cir. Sept. 24, 2010).  These four factors are "factors to be balanced, not prerequisites that must be met . . . ." *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997).  In order to establish a strong likelihood of success on the merits of a claim, "a plaintiff must show more than a mere possibility of success." *Id.* at 402.  "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

"When a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the

7

determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (quoting *Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir. 1998); *see also Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000) ("In a First Amendment case, 'the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. ") (citations omitted), *overruled on other grounds by 729, Inc. v. Kenton County Fiscal Ct.*, 515 F.3d 485 (6th Cir. 2008); *Clarkins Drive, Inc. v. Poole*, 2010 WL 2587946, at *3 (6th Cir. June 28, 2010).  "Because harm could be suffered by either party, and the public interest [lies] in the correct application of First Amendment principles, the court's decision turn[s] on the likelihood of success on the merits." *Jones*, 569 F.3d at 266 (citing *Congregation Lubavitch v. City of Cincinnati,* 923 F.2d 458, 460 (6th Cir. 1991)).  Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted).  To the extent that a plaintiff demonstrates a substantial likelihood of success on the merits, therefore, plaintiff also establishes the likelihood of irreparable harm as a result of a loss of First Amendment rights. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1490 (6th Cir. 1995).     For these reasons, the court shall begin with and devote the bulk of its analysis to the issue of whether plaintiffs have a strong likelihood of success on the merits in their case.  That is, the court shall examine whether plaintiffs have "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."

8

III.

Plaintiffs argue that § 3599.45 violates the First Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment, because (1) barring them from contributing to the election campaigns of public officials violates their rights of association and free speech, in derogation of *Buckley v. Valeo*, 424 U.S. 1 (1976), and its progeny; and (2) § 3599.45 is unconstitutionally overbroad, violating the rights of free association and free speech of a substantial number of persons whose prohibited conduct bears no rational relation to the purpose of the statute.

A.      *Whether § 3599.45 unconstitutionally infringes on plaintiffs' rights of association and speech*

In *Buckley*, the Supreme Court held that contributing to political campaigns is an activity protected by First Amendment's guarantees of free association and free speech. *Buckley*, 424 U.S. at 14-19.  The Court reached several conclusions about limits on campaign contributions and the rights of association and speech that are relevant here:

> [A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.  A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support.  The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing.  At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate.  A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.

*Id.* at 20-21.  The court also found that limits on campaign contributions are constitutional as long as they do not prevent candidates from "amassing the resources

9

necessary for effective advocacy." *Id.* at 21.  Finally, the Court found that the main concern implicated by limits on campaign contributions was whether those limits interfered with the contributor's right of association.  *Id.* at 24-25.  According to the Court, "[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate."  *Id.* at 22.  While the court noted that restrictions on the rights to association and speech are subject to the closest scrutiny, it also held that these rights were not absolute and that even significant abridgments of those rights could be sustained under certain circumstances.  *Id.* at 25.

In the wake of *Buckley*, the Supreme Court has upheld certain limits on campaign contributions.  *See McConnell v. FEC,* 540 U.S. 93 (2003), *overruled in part by Citizens United v. Federal Election Com'n,* ___ U.S. ___, 130 S. Ct. 876 (2010); *FEC v. Beaumont,* 539 U.S. 146 (2003); *Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377 (2000); *California Medical Ass'n v. Federal Election Comm'n*, 453 U.S. 182 (1981).  The Court has also struck down limits on campaign contributions when it has found that those limits contravened First Amendment rights.  *See Davis v. Federal Election Comm'n*, __ U.S. ___, 128 S.Ct. 2759 (2008); *Randall v. Sorrell*, 548 U.S. 230 (2006); and *Citizens against Rent Control v. City of Berkeley*, 454 U.S. 290 (1981).  In the course of the Court's rulings on the subject, an intermediate standard of scrutiny has emerged as the appropriate standard for determining whether a restriction on campaign contributions passes political muster.  That standard has certain characteristics that distinguish it from the strict scrutiny normally accorded violations of First Amendment rights.

First, "there is no place for a strong presumption against constitutionality, of the

10

sort often thought to accompany the words 'strict scrutiny.'"  *Nixon,* 528 U.S. at 400-01. This is because limits on campaign spending may protect the integrity of the electoral system, thus encouraging greater participation in the process.  *McConnell*, 540 U.S. at 136-37.  Such restrictions may guard against both "actual corruption and the appearance of corruption," either of which may threaten electoral integrity.  *Id.* at 136.

Second, a contribution limit will be found constitutional if it is "closely drawn" to effect a "sufficiently important" governmental interest, rather than narrowly tailored to serve a compelling governmental interest.[3]  *Buckley*, 424 U.S. at 25.  As the court has acknowledged, "[p]recision about the relative rigor of the standard to review contribution limits was not a pretense of the *Buckley per curiam* opinion."  *Nixon,* 528 U.S. at 386. Nevertheless, the Court has generally found that the more restrictive the limits placed by a legislature on campaign contributions, the more important the government interest must be to justify those restrictive limits.  For example, in striking down Vermont's unusually low limits on campaign contributions, the Court observed:

> [W]e have found nowhere in the record any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems that we have described.  Rather, the basic justifications the State has advanced in support of such limits are those present in *Buckley.*  The record contains no indication that, for example, corruption (or its appearance) in Vermont is significantly more serious a matter than elsewhere.

---

[3] That the limits on campaign contributions in the instant case constitute an outright ban on certain contributions does not affect the level of scrutiny to be applied.  As the Supreme Court has asserted, "It is not that the difference between a ban and a limit is to be ignored; it is just that the time to consider it is when applying scrutiny at the level selected, not in selecting the standard of review itself."  *Beaumont,* 539 U.S. at 162.

*Randall v. Sorrell*, 548 U.S. at 261.[4]

The Supreme Court places the evidentiary burden for establishing a sufficiently important interest on the state, and has observed, "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised."  *Nixon*, 528 U.S. at 391. In determining whether the contribution limits at issue are closely drawn to serve the government interest asserted, district courts must be cautious:

> [W]e have "no scalpel to probe" each possible contribution level.  We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives.  In practice, the legislature is better equipped to make such empirical judgments, as legislators have "particular expertise" in matters related to the costs and nature of running for office.  Thus ordinarily we have deferred to the legislature's determination of such matters.

*Randall*, 548 U.S. at 248 (citations omitted).

1.  *Whether the Secretary has asserted a state interest sufficiently important to justify limiting campaign contributions*

The Secretary asserts that Ohio's limits on campaign contributions by Medicaid providers are justified by the state's interest in preventing corruption and avoiding the appearance of corruption.  The Supreme Court ruled in *Buckley* and in several cases

---

[4]  The unusually low limits on campaign donations by the Vermont statute struck down by the Supreme Court are not relevant to the instant case.  Those limits were imposed on all donors, not merely on a small class of donors as is the case here.  Because the limits were imposed on all donors and severely constrained donations, the Supreme Court found that the limits prevented candidates, particularly candidates challenging incumbents, from raising sufficient money to conduct effective campaigns.  Thus, the limits constrained the speech rights of candidates, not merely the speech and associational rights of donors.  This is primarily why the limits in the Vermont statute were struck down.  As only a limited class of donors is barred from making campaign contributions in the instant case, the speech of the candidates is not constrained in the same way that it was  in Vermont. Consequently, the ultimate holding in *Randall* is not relevant to the instant case.

12

thereafter that such an interest is sufficiently important to justify limits on campaign contributions.  *See Buckley*, 424 U.S. at 26-29; *see also Randall*, 548 U.S. at 247-49; *McConnell*, 540 U.S. at 143-45; *Nixon*, 528 U.S. at 388-95; *California Medical Assn.*, 453 U.S. at 194-195; *Citizens Against Rent Control*, 454 U.S. at 296-297.

The Secretary presents evidence to demonstrate that Medicaid fraud is an ongoing problem in Ohio.  The Secretary has not demonstrated that Medicaid fraud in Ohio is any more or less of a problem than it is in the nation as a whole.  The Secretary offers no evidence that corruption or the appearance of corruption between Medicaid providers and county prosecutors was a particular problem at any time before, during, or after passage of SB 159.  While the Supreme Court has "never accepted mere conjecture as adequate to carry a First Amendment burden," *Nixon*, 528 U.S. at 392, the Court has also noted that corruption and the appearance of corruption are problems endemic in the American political system.  *Buckley*, 424 U.S. at 26-29; *Nixon*, 528 U.S. at 388-89.  Given the lack of novelty and high plausibility of the government interest asserted by the Secretary to justify Ohio's campaign limits, the quantum of evidence necessary to satisfy heightened judicial scrutiny in this case is extremely small.  Consequently, given the evidence presented by the Secretary regarding Medicaid fraud in Ohio, the court finds that the Secretary has carried her burden of demonstrating a sufficiently important government interest to justify limiting campaign contributions.

2. *Whether Ohio's limits on campaign contributions are closely drawn to serve the asserted government interests*

Ohio prohibits the state Attorney General and the prosecuting attorney of any of Ohio's 88 counties from accepting a campaign contribution in any amount from a

Medicaid provider under contract with the ODJFS.  This effectively prevents Ohio Medicaid providers from contributing to these campaigns.  These limits are unique in a number of respects.

First, improperly accepting a campaign contribution from a Medicaid provider, without more and without any defined *mens rea*, results in a criminal penalty.[5]  In addition, Ohio does not impose criminal penalties on other violations of Ohio's limits on campaign contributions.  Civil penalties are imposed on contractors who improperly contribute excessive amounts of money to the campaigns of persons awarding agency contracts.

Second, Ohio is the only state that imposes special limits on the campaign donations of Medicaid providers not imposed on the general population.  Ohio's justification for singling out of Medicaid providers is that Medicaid is the largest single item in the Ohio budget and that Medicaid fraud is an ongoing problem in Ohio.  As has already been noted, there is no evidence in the record that the problem of Medicaid fraud in Ohio is greater or smaller than the problem with Medicaid fraud nationwide.  In addition, the Secretary provides no evidence of the existence of a particular problem with corrupt practices or a perception of corrupt practices between Medicaid providers and either the Attorney General or prosecuting attorneys.

Third, Ohio does not merely bar Medicaid providers from contributing to the campaign of candidates for Attorney General or from contributing to the campaigns of

---

[5]  California law requires a "knowing and willful" violation of its campaign laws by lobbyists a misdemeanor punishable by a four-month ban on lobbying activity.  *See* Cal. Gov't Code §§ 91000, 91002.

persons running for prosecuting attorney in the provider's county of residence or county of practice. Ohio bars Medicaid providers from contributing to the campaigns of *any person running for prosecuting attorney in any of Ohio's 88 counties.* That is, Ohio's Medicaid providers are barred from contributing to the campaigns of persons running for an entire class of public offices statewide. There is no apparent reason why a doctor living in Ashtabula County and practicing in Cuyahoga County should be barred from contributing to the campaign of an individual running for prosecuting attorney in Hamilton County, nor does the Secretary offer such a reason.

Fourth, the campaign contribution limitation at issue is an absolute ban. Federal courts have upheld a complete ban on campaign on very few occasions, and in each case special circumstances justified the ban. Supreme Court holdings, for example, bar corporations from contributing directly to political campaigns. The Court justifies this ban because "the special characteristics of the corporate structure require particularly careful regulation." *FEC v. National Right to Work Comm.,* 459 U.S. 197, 209-10 (1982). In particular, the Court has found that such corporate economic advantages as "limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets" give corporations special power "to attract capital and to deploy . . . resources." *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 658-59 (1990), *overruled on other grounds by* Citizens United, ___ U.S. ___, 130 S. Ct. 876. The Court has found that these special economic advantages enjoyed by corporations justify completely prohibiting them from directly contributing to political campaigns.[6]

---

[6] The recent case of *Citizens United* is not to the contrary. That overturned legislation prohibiting corporations from engaging in political speech and electioneering

Three federal courts have upheld other bans on campaign contributions.  In *North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d 705 (4th Cir.1999), the Fourth Circuit upheld a ban that prohibited lobbyists from contributing to the campaigns of persons running for the North Carolina General Assembly or Council of State while the General Assembly was in session.  In upholding the ban, the court found the ban to be narrowly tailored because (1) the ban was limited to "lobbyists and the political committees that employ them--the two most ubiquitous and powerful players in the political arena" and (2) the ban was "temporally limited:  they last only during the legislative session, which typically, though not invariably, has covered just a few months in an election year.  In short, the restrictions cover only that period during which the risk of an actual *quid pro quo* or the appearance of one runs highest."  *North Carolina Right to Life,* 168 F.3d at 716.

*Institute of Governmental Advocates v. Fair Political Practices Com'n*, 164 F. Supp. 2d 1183 (E.D. Calif. 2001), is also instructive.  California first instituted a ban against lobbyists contributing to campaigns for state office in 1974 as part of a statewide ballot proposition approved by California voters.  In 1979, the California Supreme Court struck down this provision on the ground that a total ban of all contributions by any lobbyist is not a "closely drawn" restriction.  *Fair Political Pratices Comm'n v. Sup.Ct.,* 25 Cal. 3d 33, 45, 157 Cal. Rptr. 855, 599 P.2d 46 (1979).  A similar ban passed in 1996 was enjoined by the United States District Court for the Eastern District of California and affirmed by the Ninth Circuit.  *California Prolife Council PAC v. Scully,* 989 F. Supp.

---

independent of the campaigns of persons running for office.  The ban on corporate donations to political campaigns was not at issue in that case.

16

1282 (E.D. Cal. 1998), *aff'd,* 164 F.3d 1189 (9th Cir. 1999).  While the ban was still

enjoined, California passed a law modifying the ban on contributions from lobbyists.  In

*Institute of Governmental Advocates*, the district court approved the ban as modified.

The court observed:

> [The ban] does not prohibit contributions by all lobbyists to all candidates.
> Rather, by its express terms, [the statute] only prohibits contributions by
> lobbyists, if the lobbyist is *registered* to lobby the office for which the candidate
> seeks election; that is, to those persons the lobbyist *will be* paid to lobby. . . .
> Next, . . . the definition of a lobbyist has significantly changed . . . [because] the
> regulations interpreting that definition have changed.  Specifically, the current
> version . . . is much narrower, omitting from its scope certain activities and
> individuals covered by the previous definition.  As a result, certain individuals are
> no longer required to register as lobbyists.

*Institute of Governmental Advocates*, 164 F. Supp. 2d at 1190.  The court also noted

that although the ban was not temporally limited as was the ban in *North Carolina Right*

*to Life*, such temporal limitation would have been impossible because the California

legislature is in session year round.  *Id.* at 1191-92.

Ohio's ban on campaign contributions by Medicaid providers suffers from both of

the defects that had been found in the first two versions of the California ban.  First, the

ban prohibits contributions to persons running for offices that have no potential

connection to the contributor.  Medicaid providers are not merely prohibited from

contributing to the campaigns of persons running for prosecutor in the providers'

counties of residence and operation; they are prohibited from contributing to the

campaigns of persons running for prosecutor in all 88 Ohio counties.  Second, the

definitions of "Medicaid provider" and "ownership interest" in a Medicaid provider are

without limitation:  Contracts for Medicaid services and ownership interests that are *de*

*minimis* are swept within the prohibition, as were individuals with little significant

17

connection to lobbying in earlier versions of the California ban.

Finally, the Second Circuit, in *Green Party of Connecticut v. Garfield*, --- F.3d ----, 2010 WL 2737134 (2d Cir. 2010), upheld "a broad-ranging and complex statute . . . [that] prohibit[s] state contractors and certain lobbyists from (1) making campaign contributions to candidates for state office and (2) soliciting campaign contributions on behalf of candidates for state office." *Green Party*, 2010 WL 2737134 at *2. In upholding this ban with regard to current and prospective state contractors and their principals, the court wrote as follows:

> The record before us . . . shows that the General Assembly had good reason to be concerned about both the "actuality" and the "appearance" of corruption involving contractors. Connecticut's recent corruption scandals showed that contributions by contractors could lead to corruption. And it took no great leap of reasoning to infer that those scandals created a strong *appearance* of impropriety in the transfer of any money between contractors and state officials-whether or not the transfer involved an illegal *quid pro quo.* The scandals reached the highest state offices, leading to the resignation and eventual criminal conviction and imprisonment of the state's governor. They were, as a result, covered extensively by local media and garnered the attention of national media outlets as well. . . . Thus, corruption spurred by state contractors became a salient political issue in Connecticut, and there arose an appearance of impropriety with respect to all contractor contributions. . . . There is sufficient evidence in the record of actual corruption stemming from contractor contributions, and in light of the widespread media coverage of Connecticut's recent corruption scandals, the General Assembly also faced a manifest need to curtail the appearance of corruption created by contractor contributions.

*Green Party*, 2010 WL 2737134 at *7 (citations omitted). The court continued:

> It is undisputed that nearly all of the corruption scandals that gave rise to the [statute]--including the scandal involving Governor Rowland--involved both current and prospective state contractors offering bribes in exchange for assistance in winning new state contracts. Contributions by current and prospective state contractors, therefore, lie at the heart of the corruption problem in Connecticut.

*Id.* at *9.

18

The Second Circuit was well aware that a ban differed from a limit on contributions and considered whether a ban was overreaching in the case before it:

> [A] ban is a drastic measure.  A limit on contributions causes some constitutional damage, as it "*restrict[s]* 'one aspect of the contributor's freedom of political association.'"  *Randall,* 548 U.S. at 246 (quoting *Buckley,* 424 U.S. at 24-25) (emphasis added).  But a ban on contributions causes considerably more constitutional damage, as it wholly *extinguishes* that "aspect of the contributor's freedom of political association."  A limit, moreover, leaves intact the contributor's right to make "the symbolic expression of support evidenced by a contribution." *Id.* at 247 (quoting *Buckley,* 424 U.S. at 21). But a ban infringes that constitutional right, as it precludes the "symbolic expression" that comes with a small contribution.
>
> There are, therefore, undoubtedly many situations in which a strict contribution limit--as opposed to an outright contribution ban--will adequately achieve the government's objectives.  In those situations it will be difficult for the government to establish that a contribution ban is "closely drawn" to its asserted interests.  Instead, such a ban risks being struck down as unconstitutionally overbroad.
>
> Here, for example, a limit--as opposed to a ban--would likely be sufficient to address the General Assembly's interest in addressing *actual* corruption.  If, for example, the [statute] were to allow contractors to make small contributions (say, $50 per election) to state officials, it is unlikely that a contractor could exert any influence over an official with the promise of such a modest sum.  Yet such a limit would not wholly extinguish a contractor's associational rights, and it would allow the contractor to make "the symbolic expression of support evidenced by a contribution."  *Id.* at 247 (quoting *Buckley,* 424 U.S. at 21, 96 S.Ct. 612).  Thus, if the state's only interest in this case were combating *actual* corruption, the [statute's] outright ban on contractor contributions would likely be held overbroad.
>
> Combating *actual* corruption, however, is not the state's only interest here; the [statute] is also meant to address the *appearance* of corruption caused by contractor contributions. . . . Connecticut's recent corruption scandals were widely publicized, and corruption involving state contractors became a major political issue in Connecticut in recent years.  A limit on contractor contributions would have partially addressed the perception of corruption created by those incidents, but such a limit still would have allowed some money to flow from contractors to state officials.  Even if small contractor contributions would have been unlikely to influence state officials, those contributions could have still given rise to the appearance that contractors are able to exert improper influence on state officials.
>
> The [statute's] *ban* on contractor contributions, by contrast, unequivocally

19

> addresses the perception of corruption brought about by Connecticut's recent scandals.  By totally shutting off the flow of money from contractors to state officials, it eliminates any notion that contractors can influence state officials by donating to their campaigns.  Thus, although the [statute's] ban on contractor contributions is a drastic measure, it is an appropriate response to a specific series of incidents that have created a strong appearance of corruption with respect to all contractor contributions.

*Id.* at *12.  The Second Circuit held, therefore, that "in light of Connecticut's recent experience with corruption scandals involving state contractors," the statute's ban on contributions by contractors, prospective contractors, and their principals was closely drawn given the state's special interest in combating the appearance of corruption.  *Id.* at *13.

Significantly, the Second Circuit struck down a similar ban against contributions by lobbyists because the state failed to cite an exigence sufficiently serious to justify such a ban:

> [T]here is insufficient evidence to demonstrate that all lobbyist contributions give rise to an appearance of corruption, and the evidence demonstrating that lobbyist contributions give rise to an appearance of "influence" . . . has no bearing on whether the [statute's] ban on lobbyist contributions is closely drawn to the state's anticorruption interest.  We conclude, as a result, that on this record, a *limit* on lobbyist contributions would adequately address the state's interest in combating corruption and the appearance of corruption on the part of lobbyists.  The [statute's] *ban* on lobbyist contributions, therefore, is *not* closely drawn to achieve the state's anticorruption interest.  Thus, we hold that the [statutue's] ban on lobbyist contributions . . . violates the First Amendment.

*Id.* at *14 (citations and footnotes omitted).

In the instant case, the Secretary points to no evidence of any actual corruption or perception of corruption between Medicare providers and the Attorney General or the county prosecutors, much less a scandal of the magnitude of Connecticut's, that would justify a ban on campaign contributions.  As the Supreme Court noted in striking down

Vermont's campaign limits, "[T]he basic justifications the State has advanced in support of [its] limits are those present in *Buckley.* The record contains no indication that, for example, corruption (or its appearance) in Vermont is significantly more serious a matter than elsewhere."  *Randall* , 548 U.S. at 261.[7]  The same could be said of Ohio's justifications for its ban on contribution by Medicaid providers.  The ban "wholly extinguishes" the method of political association afforded by campaign contributions and precludes the "symbolic expression" permitted by a small contribution.  The Secretary does not present any exigence that would justify such a drastic measure.  Moreover, there is no evidence in the record that Ohio considered any lesser method of avoiding corruption or the appearance of corruption, such as a low limit on campaign contributions by Medicaid providers or requiring the Attorney General or county prosecutors to recuse themselves from cases and allowing subordinate attorneys to prosecute when the case involved a campaign donor.  Under these circumstances, it cannot be argued that Ohio's ban on contributions by Medicaid providers to the campaigns of the Attorney General and county prosecutors is "closely drawn" to the government interest of preventing corruption and the appearance of corruption.

In sum, Ohio's ban on contributions by Medicaid providers to the campaigns of persons running for Attorney General or county prosecutor is unique and without precedent.  The ban criminalizes conduct that most states punish with civil penalties.  It

---

[7]  The court is well aware that the campaign limits struck down in *Randall* were held invalid because they imposed serious expressive limits on the *candidates.*  The court has already noted that this consideration is not relevant in this case.  *Randall* is cited here only for the proposition that more serious constraints on campaign contributions require more exigent justifications.

bans contributions by Medicaid providers without evidence of a particular problem with corrupt practices or a perception of corrupt practices between Medicaid providers and either the Attorney General or prosecuting attorneys. It prohibits contributions to all persons running for county prosecutor, including prosecutorial offices that have no potential connection to the contributor. It broadly defines "Medicaid provider" and "ownership interest" in a Medicaid provider so as to sweep contracts for Medicaid services and ownership interests that are *de minimis* within the prohibition. Finally, the statute imposes a ban without referencing any serious exigence that would justify such an extreme measure and without evidence that the legislature considered any sanction less than a ban. Ohio's contribution ban imposed on Medicaid providers cannot be considered "closely drawn."

Given these characteristics of § 3599.45, it must be said that plaintiffs have "raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics*, 119 F.3d at 400. For these reasons, plaintiffs have demonstrated a likelihood of success on the merits going forward in the case as a whole.

B.    *Whether § 3599.45 is unconstitutionally overbroad*

Plaintiffs argue that § 3599.45 is unconstitutionally overbroad because it violates the rights of free association and free speech of a substantial number of persons whose prohibited conduct bears no rational relation to the purpose of the statute. The Secretary denies that the statute is unconstitutionally overbroad.

Generally litigants only have standing to vindicate their own constitutional rights. *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984); *Warth*

22

*v. Seldin*, 422 U.S. 490, 499  (1975) (noting that a party must "assert his own legal rights and interests, and cannot rest his claim . . . on the legal rights or interests of third parties.").   But when a statute may have a deterrent effect on free expression, a party whose conduct is not protected may challenge a statute which is facially overbroad.  *Id.* at 798; *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 957 (1984).  The relevant question when a statute is challenged on grounds of overbreadth is whether "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).

This exception to individual standing is a narrow one.  The overbreadth doctrine is "strong medicine" and should be employed "only as a last resort."  *Id.* at 613.  Consequently, a statute should be construed to avoid constitutional problems if the statute is subject to such a limiting construction or, if the statute is not subject to a narrowing construction, only the unconstitutional portion of the statute should be invalidated if it is severable from the rest of the statute.  *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).  If the statute cannot be construed to avoid constitutional problems or if the impermissible portion of the statute is not severable, then the overbreadth must be substantial before a statute will be invalidated on its face.  *Id.* at 770-73.

Plaintiffs assert that § 3599.45 is overbroad because it includes within its ban on contributions persons who are not involved in the day-to-day operation of a Medicaid provider, such as limited partners, and persons with only a small ownership interest in a Medicaid provider.  As plaintiffs argue:

23

> No reasonable threshold below which that interest might be too diluted is offered. A one-percent partner, or an individual who owns a single share of common stock in a publicly traded corporation, a branch of which provides durable medical equipment under Medicaid, or a single share in a large pharmacy chain that is a Medicaid provider, or a single share in even department store with a pharmacy that services Medicaid patients, are forbidden individual contributors. Persons with absolutely no control over the policy or business practices of a corporate Medicaid provider are banned all-the-same from contributing.

Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Exh. 13, p. 11.

The Secretary responds in three ways.  First, she observes that a statute may only be invalidated pursuant to overbreadth if the statute "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'"  *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003).  The Secretary proposes that § 3599.45 has a plainly legitimate sweep, but she draws no conclusion from this regarding the amount of protected free speech punished by the statute.

The court construes the Secretary's argument as asserting that in comparison to the legitimate sweep of § 3599.45, the amount of protected free speech punished by the statute is not substantial.  However, § 3599.45 apparently has no legitimate application to the plaintiffs before the court.  Nevertheless, the Secretary does indicate a flaw in plaintiffs' case:  Plaintiffs have made no effort to demonstrate the extent of the alleged overbreadth in § 3699.45.  That is, plaintiffs have not attempted to demonstrate the number of limited partners or minor shareholders of corporations who are subject to the reach of § 3599.45.  Indeed, plaintiffs have not demonstrated that *any* Ohio Medicaid provider is a limited partnership or a publicly-held corporation.

Second, the Secretary asserts that § 3599.45 does not punish a substantial amount of free speech because, although it bans persons with a minimal ownership

24

interest in a Medicaid provider, the appearance of corruption would arise from a donation by a person with an ownership interest in a Medicaid provider regardless of the size of the donor's ownership share in the provider.  The Secretary's argument on this point is not entirely clear.

Finally, the Secretary argues that the legislature properly tailored the statute, as evidenced by the persons who are not included within its ambit, such as employees, family members, and other persons affiliated with Medicaid providers.  Moreover, the Secretary argues, this careful crafting expressed the legislature's best judgment as to the proper methods of avoiding circumvention of the contribution ban.  As this legislation reflects the legislature's best judgment on a matter calling for considered precision, it is inappropriate for the court to second-guess legislative intent in this matter.

Whether the legislature's acts are "carefully considered" is irrelevant to determining whether legislation should be struck as overbroad.  In making such a determination, only three considerations are relevant:  (1) whether § 3599.45 can be construed to avoid overbreadth; (2) if the statute may not be so construed, whether the unconstitutional portion may be severed from the rest of the statute; and (3) if the statute may not be constitutionally construed or the unconstitutional portion severed, whether the overbreadth is substantial.

Despite these problems with the Secretary's objections, plaintiffs have not, at this point in the proceedings, demonstrated that § 3599.45 is unconstitutionally overbroad.  Even if we assume, without deciding, that the limitations on campaign contributions in § 3599.45 bear no rational relation to persons not connected with the day-to-day operation of a Medicaid provider or to persons with a *de minimis* ownership interest in a

Medicaid provider, plaintiffs' arguments, as discussed below, pass only two of the three tests that must be applied in determining whether a statute is unconstitutionally overbroad.

Section 3599.45(A) cannot be construed so as to avoid overbreadth.  The terms of the statute are unequivocal:  "No candidate for the office of attorney general or county prosecutor or such a candidate's campaign committee shall knowingly accept any contribution from a provider of services or goods under contract with the department of job and family services . . . *or from any person having an ownership interest in the provider*" (emphasis added).  There is no way of construing these words so as to both (1) avoid suppressing the speech of persons who are not involved in the day-to-day operation of a Medicaid provider and persons with only a small ownership interest in a Medicaid provider and (2) without lifting the ban on individuals with a substantial ownership interest in the provider and whose campaign contributions might properly be limited by the legislature.  Furthermore, the Secretary has offered no such saving construction.

Nor is it possible to sever the unconstitutional portion of the statute.  The court is ill-suited to determine the amount of an individual's interest in a Medicaid provider that would justify a limitation on the individual's campaign contributions.  Such judgments based on independent findings of fact are properly the business of the legislative branch.  Thus, the court cannot say that the legislature may properly limit contributions of persons who own a particular percentage of a Medicaid provider or who earn a specific amount of income from their ownership interest.  Absent a clear legal dividing line between what is a significant ownership share and what is *de minimis*, the court

26

cannot sever the unconstitutional portion of the statute.

As already noted, however, plaintiffs fail to demonstrate that the overbreadth implicated by the statute is substantial.  The record before the court is silent as to how many Medicaid providers are limited partnerships or publicly held corporations.  This much, at least, is essential before the court can even begin to estimate whether the number of *de minimis* owners of Medicaid providers is "substantial."  Consequently, plaintiffs' arguments do not pass the third prong of the test for overbreadth.

For these reasons, plaintiffs have failed to demonstrate that the reach of § 3599.45 is unconstitutionally overbroad.

IV.

For the reasons given above, § 3599.45 (1) is not closely drawn to further a government interest sufficiently important to justify its restrictions of speech and association but (2) has not be proven to be overbroad.  As § 3599.45 fails the appropriate test of its constitutionality, it must be declared unconstitutional on its face.

Plaintiffs' arguments meet three of the four prongs of the test used to determine whether a preliminary injunction should issue.  First, the unconstitutionality of the statute means that plaintiffs demonstrate that they have a strong likelihood of success on the merits.  Second, plaintiffs demonstrate that they would suffer irreparable injury absent a stay, since "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373 (citation omitted); *see also Connection Distributing*, 154 F.3d at 288 (finding that to the extent that a plaintiff demonstrates a substantial likelihood of success on the merits, plaintiff also establishes the likelihood of irreparable harm as a result of a loss of First Amendment

27

rights).  Third, there is no evidence on the record that Ohio would suffer substantial harm if the court grants the requested stay.  Although the Secretary asserts that Ohio would suffer corruption and the perception of corruption if prohibited from enforcing the statute, she offers no elaboration, explanation, or evidentiary basis for this conclusion. Absent more, the court cannot say that "substantial harm" would follow from a prohibition on enforcing the statute.  Fourth, the public interest would be served by granting the request for an injunction.  Because "the public interest [lies] in the correct application of First Amendment principles, the court's decision turn[s] on the likelihood of success on the merits."  *Jones*, 569 F.3d at 266.  Consequently, the public's interest in this case lies in prohibiting the enforcement of an unconstitutional statute.  In sum, application of the four part test to determine whether a preliminary injunction should issue leads to the overwhelming conclusion that the injunction should, indeed, issue.

It is not possible to sever all the unconstitutional portions of § 3599.45 while preserving the constitutional portions.  Some unconstitutional portions of the statute, indeed might be severed.  For example, the ban on contributing to the campaigns of all country prosecutor's might be reduced to a ban on contributing to the campaigns of those county prosecutors in the Medicaid provider's home county and any county in which the provider does business.  There is no way, however, to sever the unconstitutional ban on contributions from the rest of the statute.  Given the Supreme Court's jurisprudence on the matter, limitations on campaign contributions, even serious limitations on those contributions, are appropriate to avoid corruption or the appearance of corruption, even when there is no evidence of particular, serious, or imminent corruption before the legislature.  However, it is not appropriate for the court to

28

determine specific campaign contribution limits, given the situation in Ohio and the perceptions of its citizens.  Such matters are properly within the province of the Ohio legislature, with the *proviso* that the legislature must stay within constitutional limits in addressing this issue.  As the Supreme Court has observed:

> [W]e have "no scalpel to probe" each possible contribution level.  We cannot determine with any degree of exactitude the precise restriction necessary to carry out the statute's legitimate objectives.  In practice, the legislature is better equipped to make such empirical judgments, as legislators have "particular expertise" in matters related to the costs and nature of running for office.

*Randall*, 548 U.S. at 248 (citations omitted).  As all unconstitutional portions of § 3599.45 cannot be severed from the constitutional portions in an attempt to preserve the constitutional portions of the statute, any injunction must prohibit enforcement of all portions of the statute.

V.

The court is concerned by an issue raised by the Secretary for the first time in oral argument and not further developed then or since.  The Secretary argues that a motion for an injunction prohibiting her from enforcing § 3599.45 is inappropriate because she is not charged with enforcing that statute.  At least with respect to the criminal penalties attached to the statute, the Secretary asserts, the Attorney General and the 88 county prosecutors are charged with prosecuting violations of the statute.  The Secretary's duties with regard to enforcing that statute or any election statute have not been clarified by either party.

The Secretary does not argue that she is an improper party to this suit.  She does argue, however, that, as a practical matter, plaintiffs have not joined all parties necessary for them to obtain complete relief, *viz.* the Attorney General and Ohio's 88

29

county prosecutors.  The Secretary seems to be arguing, therefore, not that an injunction is an inappropriate remedy but that enjoining the Secretary is, at best, an inadequate or incomplete remedy.

Complicating the problem is the structure of § 3599.45.  The statute criminalizes *accepting* campaign contributions, not *giving* them.  Whether the Attorney General or a county prosecutor will be willing to accept plaintiffs' proffered donations upon issuance of a preliminary injunction prohibiting the Secretary from enforcing § 3599.45 is purely speculative.  That, nevertheless, is the remedy for which plaintiffs have prayed in their complaint and which is the subject of this motion.

Unfortunately, the Secretary has neither developed her argument nor properly placed this argument within the legal framework the court must consider in determining whether to grant a motion for a preliminary injunction.  During oral argument and in her Proposed Findings of Fact and Conclusions of Law, the Secretary treats the issue as related to determining whether plaintiffs will suffer irreparable harm if the motion is not granted.  Proposed Findings of Fact and Conclusions of Law, Doc. No. 14, pp. 18-19.  Plaintiffs *will* be harmed if the court does not issue the injunction because there is no possibility that their donations will be accepted.  Despite the foregoing, plaintiffs have not shown that they will receive meaningful relief from the requested injunction.  On the other hand, the Secretary has not shown that an the injunction would be entirely futile.  Absent such a demonstration that an injunction would be entirely futile, and given the analysis in the preceding sections of this Report and Recommendation, the court concludes that the requested injunction should issue because of the significant First Amendment rights involved.

VI.

Section 3599.45 is unconstitutional on its face, and it is not possible to sever the unconstitutional portions of § 3599.45 in an attempt to preserve the constitutional portions.  Application of the appropriate test for determining whether a preliminary injunction should issue overwhelmingly leads to the conclusion that the court should issue an injunction prohibiting enforcement of the statute.  Consequently, plaintiffs' motion for a preliminary injunction prohibiting the Secretary from enforcing § 3599.45 statute should be granted and the injunction should issue.

Date:  October 12, 2010                             /s/ Nancy A. Vecchiarelli
                                                                United States Magistrate Judge

## OBJECTIONS

**By stipulation of the parties, any objections to this Report and Recommendation must be filed with the Clerk of Courts within seven (7) days after the party objecting has been served with a copy of this Report and Recommendation, and Responses must be filed within three (3) days thereafter. *See* Stipulation Regarding Objections and Responses, Doc. No. 15.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**